UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          CIVIL ACTION NO:

_____

|  |  |  |
|---|---|---|
| JUNE KEPLER, | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| | ) | |
| PAVESTONE, LLC, | ) | |
| & THE QUIKRETE COMPANIES, LLC | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

_____

### <u>COMPLAINT AND JURY DEMAND</u>

### <u>Parties</u>

1.      The Plaintiff, June Kepler ("Ms. Kepler" or "Plaintiff") is a resident of the State

of New York, residing at 366 Sylvan Lake Road, Hopewell Junction, NY 12533.

2.      Defendant, Pavestone LLC ("Pavestone") is a for profit corporation that is

incorporated in the State of Delaware and does business in the State of New York, including by

operating, and conducting business at, a facility located at 43 Leonards Drive, Montgomery, NY

12549.

3.      Defendant, The Quikrete Companies, LLC ("Quikrete") (Pavestone and Quikrete,

individually and collectively, the "Company" or "Defendants") is a for profit corporation that is

incorporated in the State of Delaware and does business in the State of New York, including by

operating, and conducting business at, a facility located at 43 Leonards Drive, Montgomery, NY 12549.

## Jurisdiction and Venue

4.      The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought claims pursuant to the Americans with Disabilities Act (42 U.S.C. §§12101, *et seq.*). The court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

5.      Venue is appropriate in the Southern District of New York as the acts or omissions giving rise to the claims in this Complaint occurred in the Southern District of New York.

6.      This court has personal jurisdiction over Pavestone because, during the relevant period, Pavestone engaged in and transacted business in the State of New York, including by owning, managing and/or operating facilities in New York, and/or by employing the Plaintiff in New York, and the Plaintiff's causes of action stem largely from business transactions and employment actions by Pavestone within the State of New York.  Pavestone is registered as a foreign corporation conducting business in the State of New York. Indeed, the Plaintiff was employed by Pavestone in the State of New York, was managed and reprimanded by Pavestone in the State of New York and was terminated by Pavestone in the State of New York.

7.      This court has personal jurisdiction over Quikrete because, during the relevant period, Quikrete engaged in and transacted business in the State of New York, including by owning, managing and/or operating facilities in New York, and/or by employing the Plaintiff in New York, and the Plaintiff's causes of action stem largely from business transactions and employment actions by Quikrete within the State of New York.  Quikrete is registered as a

foreign corporation conducting business in the State of New York Indeed, the Plaintiff was employed by Quikrete in the State of New York, was managed and reprimanded by Quikrete in the State of New York and was terminated by Quikrete in the State of New York.

### Statement of Facts

8.      Starting on or around June 6, 2016, Ms. Kepler began employment, ostensibly for Pavestone, as a transportation manager based at the Company office in Montgomery, NY.  At all relevant times, Ms. Kepler's worksite was at the Company office in Montgomery, NY.

9.      At all relevant times, Pavestone was owned and operated by Quikrete.

10.     Upon information and belief, as the parent company to Pavestone, Quikrete exercised influence over the hiring and firing decisions related to Ms. Kepler's employment, had a role in Ms. Kepler's daily assignments, and maintained human resources functions over Ms. Kepler's employment.

11.     Upon information and belief, Pavestone and Quikrete share one or more principals, or one or more board members.

12.     Upon information and belief, Pavestone and Quikrete shared common human resources and labor relations functions, personnel, policies, files, records, and practices.

13.     Accordingly, Pavestone and Quikrete were joint employers of Ms. Kepler pursuant to relevant state and federal laws.

14.     Indeed, both Pavestone and Quikrete were appropriately named as employers and respondents in Ms. Kepler's Charge of Discrimination, shared counsel for representation, and neither entity raised an objection to both being named as a joint employer and party to the charge.

15.     At all relevant times, the Company (including both Pavestone and Quikrete individually) employed 15 or more employees during 20 or more calendar weeks during the relevant calendar years.

16.     Accordingly, at all relevant times, the Company (including both Pavestone and Quikrete individually) was an employer under federal anti-discrimination laws and the New York State Human Rights Law.

17.     Indeed, at all relevant times, the Company (including both Pavestone and Quikrete individually) employed 50 or more employees during 20 or more calendar weeks during the relevant calendar years.

18.     Accordingly, at all relevant times, the Company (including both Pavestone and Quikrete individually, as well as collectively) was a covered employer under the Family and Medical Leave Act ("FMLA").

19.     During her employment, Pavestone and Quikrete were so interrelated that they should be considered a single integrated employer of the Plaintiff (including under applicable FMLA tests).

20.     Upon information and belief, Pavestone and Quikrete shared an interrelation between business operations. Indeed, Quikrete exercised influence over the hiring and firing decisions related to employees' (including Ms. Kepler's) employment, had a role in daily assignments, and maintained human resources functions over employees' (including Ms. Kepler's) employment.

21.     Upon information and belief, Pavestone and Quikrete shared common management, and Quikrete had a managing supervisor to oversee Pavestone operations.

22.     Upon information and belief, Quikrete exercised centralized labor functions, including human resources functions, for Pavestone.

23.     At all relevant times, Ms. Kepler was a qualified employee, and her job performance was satisfactory.

24.     On or around September 29, 2020, Ms. Kepler was getting out of bed and suddenly suffered a variety of symptoms.  Indeed, her vision was blurry, objects appeared double in her vision, and she suffered from a debilitating headache so severe that she could not maintain muscle balance while standing on her feet.

25.     Additionally, Ms. Kepler was alarmingly also having difficulty turning to her left side.

26.     Due to these extreme medical symptoms, Ms. Kepler had to crawl to her cell phone (as Ms. Kepler could not walk on her own) and phoned an emergency line to transport her to the hospital emergency room.

27.     Ms. Kepler additionally called the plant manager, and her direct supervisor, Edward Blondin ("Mr. Blondin"), disclosed her severe symptoms, noted that she was visiting the emergency room, and asked to be allowed to miss work that day due to these severe medical symptoms.

28.     Mr. Blondin is a non-disabled man.

29.     On or around September 30, 2020, Ms. Kepler's doctor officially diagnosed her with lateral medullary syndrome, or "Wallenberg Syndrome," (a neurological condition caused by a stroke occurring in the brain stem).

30.     Ms. Kepler's doctor confirmed her symptoms had been the result of a stroke occurring in her brain stem (which then caused her to develop Wallenberg Syndrome).

31.     Ms. Kepler's Wallenberg Syndrome, as well as the lasting effects of the underlying stroke, is an impairment which substantially limits one or more major life activities, including, but not limited to, eating, walking, sleeping, and otherwise engaging in strenuous physical activity. Ms. Kepler's Wallenberg Syndrome is further an impairment which affects one or more major bodily functions, including her neurological functions. Accordingly, at all relevant times, Ms. Kepler was (and still is) disabled under federal law and New York state law.

32.     Because she was hospitalized and received continuing care from a medical provider, Ms. Kepler's Wallenberg Syndrome is further a serious health condition as defined by the FMLA.

33.     From the hospital, Ms. Kepler called Mr. Blondin and disclosed her Wallenberg Syndrome disability, including disclosing that she had suffered a stroke prior to her diagnosis and was continuing to experience symptoms.

34.     Ms. Kepler then requested the reasonable disability-related accommodation of taking approximately one month off of work in order to receive treatment and recuperate from the flare-up of her disability.

35.     At all relevant times, the Company (both Pavestone and Quikrete individually) employed 50 or more employees within a 75-mile radius of the worksite where Ms. Kepler worked.

36.     Furthermore, at this time and at all relevant times thereafter, Ms. Kepler had been an employee for at least 12 months and had worked in excess of 1250 hours during the preceding 12-month period. As such, Ms. Kepler was an eligible employee for leave protected under the FMLA.

37.     As such, this reasonable accommodation request for disability leave further constituted a request for protected FMLA leave.

38.     Indeed, Mr. Blondin and Ms. Kepler discussed at length the steps for preparing FMLA paperwork to send to the Company's insurance provider.

39.     On or around October 2, 2020, Ms. Kepler's doctor appropriately filled out the paperwork and timely submitted Ms. Kepler's leave request paperwork to the Company's insurance provider.

40.     Around this time, Ms. Kepler further submitted a copy of the prepared FMLA paperwork to Elizabeth Rueda ("Ms. Rueda"), who handles benefits at the Company; Dalia Chavez ("Ms. Chavez"), the Company's Human Resources representative; Charles Tiches ("Mr. Tiches"), the general manager; and Mr. Blondin.

41.     Upon information and belief, Ms. Rueda is non-disabled.

42.     Upon information and belief, Ms. Chavez is non-disabled.

43.     Upon information and belief, Mr. Tiches is non-disabled.

44.     Ms. Kepler utilized her FMLA leave.

45.     On or around November 1, 2020, Ms. Kepler provided a doctor's clearance to Ms. Chavez to return to work. She then resumed her responsibilities as transportation manager at the Company.

46.     Upon her return, Ms. Kepler requested the reasonable disability-related accommodation of using a walker at work, which helped her balance and remain mobile during any potential flareups of her disability.

47.     Mr. Blondin approved this request.

48.     In or around December 2020, Ms. Kepler began suffering a series of debilitating headaches.

49.     Shortly after these headaches began occurring, Ms. Kepler disclosed these headaches to Mr. Blondin.

50.     On or around February 24, 2021, Ms. Kepler was diagnosed with hypertension (more commonly known as chronic high blood pressure), which contributed to the cause of her series of headaches, and she was placed on medication.

51.     Ms. Kepler's chronic hypertension is an impairment which substantially limits one or more major life activities, including, but not limited to, eating, running, lifting and otherwise engaging in strenuous physical activity. Ms. Kepler's chronic hypertension is further an impairment which affects one or more major bodily functions, including her circulatory functions. Accordingly, at all relevant times, Ms. Kepler was (and still is) disabled under federal law and New York state law.

52.     Ms. Kepler's chronic hypertension is further a serious health condition as defined by the FMLA because she received continuing care for this condition, including regular medication.

53.     Ms. Kepler disclosed this chronic hypertension disability diagnosis to both Mr. Blondin and Mr. Tiches.

54.     Mr. Blondin and Mr. Tiches appeared apprehensive once Ms. Kepler disclosed this disability. Indeed, due to their reaction, Ms. Kepler felt discouraged by the Company for requesting accommodations related to her disability.

55.     Nevertheless, around this time, due to increasing pain, Ms. Kepler requested the disability-related accommodation of two days off of work due to a flareup of her hypertension disability, including symptoms such as chest pains, breathlessness, and fatigue.

56.     Other than the two days off, Ms. Kepler continued to successfully perform all essential functions of her position, with or without accommodations.

57.     On or around March 3, 2021, Ms. Kepler's doctor informed her (Ms. Kepler) that her blood pressure had remained high and that she (Ms. Kepler) should therefore consult an aortic doctor.

58.     On or around March 25, 2021, Ms. Kepler saw an aortic doctor.  As part of her treatment, her aortic doctor prescribed a heart monitor to wear for a period of time.

59.     Ms. Kepler disclosed to multiple individuals at the Company, including Mr. Blondin, Mr. Tiches, and Ms. Rueda, that she had to wear a heart monitor for a period of time related to her blood pressure disability.

60.     Ms. Kepler noticed a collective atmosphere of apprehension and annoyance upon disclosing this further disability to the Company.

61.     Around this time, Ms. Kepler verbally spoke with the benefits coordinator, Ms. Rueda, and requested additional FMLA paperwork, as Ms. Kepler anticipated potentially going out on either continuous or intermittent leave due to her continuing disability symptoms.

62.     Ms. Kepler informed the Company, including Ms. Rueda, that her next doctor's appointment and aortic consult were on April 14, 2021 and April 22, 2021, and she could have the doctors fill out any leave paperwork following those appointments.

63.     As a result of this conversation, Ms. Rueda emailed Ms. Kepler FMLA paperwork to be filled out by her doctor after the April appointments.

64.     Around this time, Ms. Kepler had to utilize three days of bereavement leave to attend her mother's funeral, as she had recently unexpectedly passed away.  This leave was provided under Company policies, and the Company routinely allowed non-disabled employees to utilize similar leave when they experienced deaths in their families. Ms. Kepler appropriately communicated and received agreement from Ms. Chavez to utilize this leave for her mother's passing.

65.     On or around April 7, 2021, Ms. Kepler returned to the Company and was called in to a meeting. Present in this meeting were Steve Riebe ("Mr. Riebe"), the operations manager of the Company, and Jeff Williams ("Mr. Williams"), the acting general manager (as Mr. Tiches had quit around this time). Ms. Chavez was also present via teleconference.

66.     Upon information and belief, Mr. Riebe is non-disabled.

67.     Upon information and belief, Mr. Williams is non-disabled.

68.     Mr. Riebe began the meeting by telling Ms. Kepler that the Company was aware she had "health issues" (directly referring to her disabilities), but that the Company could not afford to employ her if she expected to go out on leave.

69.     It was clear from this statement that the Company was threatening to retaliate against Ms. Kepler if she insisted on utilizing FMLA leave and that the Company was likewise utilizing this threat of retaliation to interfere with Ms. Kepler's FMLA rights by impeding her from requesting and/or utilizing future FMLA leave to which she was entitled.

70.     Ms. Kepler explained that she likely required a limited amount of leave in the near future due to her disabilities, and noted that she planned to turn in FMLA paperwork to Company after seeing her doctors later that month.

71.     Mr. Riebe then told Ms. Kepler she was being immediately fired by the Company.

72.    Accordingly, Ms. Kepler was involuntarily terminated from her employment on April 7, 2021.

73.    Although no reason was given at the time of her termination (other than concern that she planned to utilize protected leave), the Defendants later (in response to the Agency Charge of Discrimination) alleged attendance issues related to Ms. Kepler's employment.

74.    Notably, at the time of her termination, the Company did not allege that Ms. Kepler was being fired because of attendance issues unrelated to her disability, although there had been indications that the firing was due to leave requested by Ms. Kepler related to her disability.

75.    Upon information and belief, the Company retroactively invented a new pretextual justification for the termination in an attempt to cover up the discriminatory and retaliatory motivations for its improper actions.

76.    Upon information and belief, Ms. Kepler was replaced in her position by a non-disabled individual.

77.    Importantly, the Company employs a progressive disciplinary policy in which disciplinary violations (including attendance violations) resulted first in a verbal warning, then a written warning, and then a suspension, all before potential termination.

78.    The Company routinely utilized multiple steps of progressive discipline related to non-disabled employees with excessive absences.

79.    Importantly, the Company skipped one or more steps within its typical progressive discipline process when it suddenly terminated Ms. Kepler.

80.    Indeed, prior to her sudden termination, Ms. Kepler had never received any discipline of any type for any supposed attendance violations.

81.    On or around November 8, 2021, the Plaintiff timely filed a Charge of

Discrimination with the New York State Division of Human Rights ("NYSDHR"), which was

cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

82.    On or around March 23, 2022, The Plaintiff informed the NYSDHR of her intent

to remove her charge in order to pursue her claims in court and accordingly requested that the

NYSDHR provide an administrative convenience dismissal to allow her to pursue her claims in

court.

83.    On or around April 4, 2022, the NYSDHR issued the Plaintiff an administrative

convenience dismissal allow her to pursue her claims in court.

84.    On or around June 8, 2022, the EEOC provided the Plaintiff with a Notice of a

Right to Sue letter.

85.    This Complaint is timely filed in compliance with the timeframes of relevant laws

and requirements

## COUNT I

**(Disability Discrimination and Failure to Accommodate in Violation of the New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Ms. Kepler v. All Defendants (Pavestone and Quikrete)**

86.    Ms. Kepler incorporates all paragraphs above and below as if set forth fully

herein.

87.    At all relevant times, the Company (including both Pavestone and Quikrete

individually) employed four or more persons.

88.    The Company is an employer under the definition of Executive Law Article 15

("NYSHRL").

89.     Ms. Kepler suffers (and at all relevant times suffered) from Wallenberg Syndrome and hypertension.

90.     Ms. Kepler's Wallenberg Syndrome is a physical impairment which substantially limits one or more major life activities, including, but not limited to, eating, walking, sleeping, and otherwise engaging in strenuous physical activity. Ms. Kepler's Wallenberg Syndrome is further an impairment which affects one or more major bodily functions, including her neurological functions. Accordingly, Ms. Kepler is disabled under state law.

91.     Ms. Kepler's chronic hypertension is a physical impairment which substantially limits one or more major life activities, including, but not limited to, eating, running, lifting and otherwise engaging in strenuous physical activity. Ms. Kepler's chronic hypertension is further an impairment which affects one or more major bodily functions, including her circulatory functions. Accordingly, Ms. Kepler is disabled under state law.

92.     Ms. Kepler disclosed her disabilities to the Defendants, the Defendants knew about Ms. Kepler's disabilities, and/or the Defendants regarded Ms. Kepler as disabled.

93.     Ms. Kepler requested disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job.  These requested reasonable accommodations included, but were not limited to, one or more disability-related medical leaves and the use of a walker in the workplace.

94.     The disability-related accommodations requested by Ms. Kepler did not pose an undue burden on Defendants.

95.     The Defendants failed to engage in an interactive dialogue related to one or more of these disability-related accommodation requests.

96.     The Defendants unlawfully denied or interfered with one or more of Ms. Kepler's disability-related accommodation requests, including by failing to grant leave by terminating her employment before she could hand in the paperwork (which they had notice of her intent to file) and/or failing to engage in an interactive dialogue regarding alternative accommodations.

97.     Defendants discriminated against Ms. Kepler due to her disabilities by subjecting Ms. Kepler to adverse employment actions, including, but not limited to, subjecting Ms. Kepler to a harassing and otherwise hostile work environment, by inappropriately classifying Ms. Kepler's protected disability leaves as attendance violations on one or more occasions, by denying one or more disability-related accommodations, by skipping one or more disciplinary steps, and/or terminating Ms. Kepler's employment.

98.     Non-disabled employees of the Company were treated more favorably than Ms. Kepler, including through not being improperly harassed, not subjected to a hostile work environment, not denied the benefit of progressive discipline/progressive performance management prior to termination, and/or not being terminated.

99.     Upon information and belief, the Company replaced Ms. Kepler with a lesser or similarly qualified, non-disabled employee.

100.    Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Kepler and/or conduct so reckless to amount to such disregard.

101.    As a direct and proximate result of the Defendants' violations of the NYSHRL, Ms. Kepler has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

102.     Ms. Kepler seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, emotional distress damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, punitive damages, interest, attorneys' fees, and costs.

## COUNT II

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.*)**

### Ms. Kepler v. All Defendants (Pavestone and Quikrete)

103.     Ms. Kepler incorporates all paragraphs above and below as if set forth fully herein.

104.     At all relevant times, the Company (both Pavestone and Quikrete individually) employed fifteen or more persons for 20 or more weeks in the preceding 12 months.

105.     The Company is an employer under the definition of the ADA.

106.     Ms. Kepler suffers (and at all relevant times suffered) from Wallenberg Syndrome and chronic hypertension.

107.     Ms. Kepler's Wallenberg Syndrome is an impairment which substantially limits one or more major life activities, including, but not limited to, eating, walking, sleeping, and otherwise engaging in strenuous physical activity. Ms. Kepler's Wallenberg Syndrome is further an impairment which affects one or more major bodily functions, including her neurological functions. Accordingly, Ms. Kepler is disabled under federal law.

108.     Ms. Kepler's chronic hypertension is an impairment which substantially limits one or more major life activities, including, but not limited to, eating, running, lifting and

otherwise engaging in strenuous physical activity. Ms. Kepler's chronic hypertension is further an impairment which affects one or more major bodily functions, including her circulatory functions. Accordingly, Ms. Kepler is disabled under federal law.

109.    Ms. Kepler disclosed her disabilities to the Defendants, the Defendants knew about Ms. Kepler's disabilities, and/or the Defendants regarded Ms. Kepler as disabled.

110.    Ms. Kepler requested disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job.  These requested reasonable accommodations included, but were not limited to, one or more disability-related medical leaves and the use of a walker in the workplace.

111.    The disability-related accommodations requested by Ms. Kepler did not pose an undue burden on Defendants.

112.    The Defendants failed to engage in an interactive dialogue related to one or more of these disability-related accommodation requests.

113.    The Defendants unlawfully denied or interfered with one or more of Ms. Kepler's disability-related accommodation requests, including by failing to grant leave by terminating her employment before she could hand in the paperwork (which they had notice of her intent to file) and/or failing to engage in an interactive dialogue regarding alternative accommodations.

114.    Defendants discriminated against Ms. Kepler due to her disabilities by subjecting Ms. Kepler to adverse employment actions, including, but not limited to, subjecting Ms. Kepler to a harassing and otherwise hostile work environment, by inappropriately classifying Ms. Kepler's protected medical leaves as attendance violations on one or more occasions, by denying one or more disability-related accommodations, by skipping one or more disciplinary steps, and/or terminating Ms. Kepler's employment.

115.     Non-disabled employees of the Company were treated more favorably than Ms. Kepler, including through not being improperly harassed, not subjected to a hostile work environment, not denied the benefit of progressive discipline/performance management prior to termination, and/or not being terminated.

116.     Upon information and belief, the Company replaced Ms. Kepler with a lesser or similarly qualified, non-disabled employee.

117.     Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Kepler and/or conduct so reckless to amount to such disregard.

118.     As a direct and proximate result of the Defendants' violations of the ADA, Ms. Kepler has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

119.     Ms. Kepler seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, emotional distress damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, punitive damages, interest, attorneys' fees, and costs.

## COUNT III

**(Interference with, and Retaliation for Exercising, Rights Under the Family and Medical Leave Act – 29 U.S.C. § 2615)**

### Ms. Kepler v. Defendants (Pavestone and Quikrete)

120.     Ms. Kepler incorporates all paragraphs above and below as if set forth fully herein.

121.    The Defendants are (and at all relevant times were) engaged in an industry affecting commerce.

122.    The Defendants are an integrated employer for the purposes of FMLA because they are so interrelated in business operations, shared common management, share a centralized control of labor relations, and shared a degree of common financial control or ownership.

123.    The Defendants employed 50 or more employees during 20 or more calendar weeks in each current and/or preceding calendar year.

124.    Accordingly, the Defendants (both collectively, and each individually) were a covered employer under the FMLA.

125.    Ms. Kepler was an eligible employee under the FMLA because at all relevant times she had worked for the Defendants for 12 or more months and had worked in excess of 1,250 hours within the past 12-month period.

126.    In addition, the Defendants (including the Company) employed 50 or more employees within 75 miles of the worksite at which Ms. Kepler was based.

127.    Ms. Kepler suffered from one or more serious health conditions which required continuing treatment by a healthcare provider, including Wallenberg Syndrome and chronic hypertension.

128.    Ms. Kepler requested FMLA-eligible disability leave including in the form of one or more leaves for her disabilities, related to the need to take time off for her serious health conditions and/or to undergo treatment for her serious health conditions (including recuperating from medical treatment).

129.    The Defendants interfered with, restrained, and/or denied the exercise of, or the attempted exercise of, Ms. Kepler's rights under the FMLA.

130.    For example, the Defendants, including through their agents, attempted to impede (and did impede) Ms. Kepler's use of FMLA leave when the Defendants threatened to retaliate against Ms. Kepler if she requested and/or utilized FMLA leave, retro-actively revoked and/or denied FMLA leave requested and utilized by Ms. Kepler (including by terminating Ms. Kepler for taking such leave), and terminated Ms. Kepler in whole or in part because of her notice of intent to file for FMLA leave and once she was in possession of the requisite FMLA paperwork (seemingly so that the Company would not be obligated to grant Ms. Kepler her anticipated FMLA leave). Indeed, it was clear that Ms. Kepler's request for FMLA was a motivating factor in the Defendants' decision to terminate Ms. Kepler's employment.

131.    Ms. Kepler thus was denied the ability to utilize FMLA leave that she needed, requested, and wanted to utilize.

132.    Ms. Kepler engaged in activity protected under the FMLA both by requesting and utilizing FMLA-protected leave.

133.    The Defendants retaliated against Ms. Kepler for the exercise of her protected FMLA rights, and for engaging in other protected activity, by subjecting her to adverse employment actions, including, but not limited to, subjecting Ms. Kepler to a harassing and otherwise hostile work environment, by inappropriately classifying Ms. Kepler's protected medical leaves as attendance violations on one or more occasions, by denying one or more disability-related accommodations, by skipping one or more disciplinary steps, and/or terminating Ms. Kepler's employment.

134.    The Defendants' actions, including their violations of the FMLA, were willful and in bad faith.

135.     As a direct and proximate result of the Defendants' violation of the FMLA, Ms. Kepler has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

136.     Ms. Kepler seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, liquidated (i.e. double) damages, interest, attorney's fees, and costs.

## COUNT IV

### (Retaliation in Violation of the New York State Human Rights Law, Executive Article 15, Section 296)

### Ms. Kepler v. All Defendants (Pavestone and Quikrete)

137.     The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

138.     The Plaintiff engaged in protected activity under the NYSHRL, including, but not limited to, requesting and utilizing reasonable accommodations for a disability.

139.     The disability-related accommodation requests which Defendants retaliated against the Plaintiff for requesting included, but were not limited to, one or more days off as protected leave.

140.     Defendants unlawfully coerced, intimidated, threatened, and/or interfered with the Plaintiff's exercising of or enjoyment of rights granted by the NYSHRL.

141.    More specifically, the Defendants subjected the Plaintiff to adverse employment actions, including, but not limited to, subjecting Ms. Kepler to a harassing and otherwise hostile work environment, by inappropriately classifying Ms. Kepler's protected medical leaves as attendance violations on one or more occasions, by denying one or more disability-related accommodations, by skipping one or more disciplinary steps, and/or terminating Ms. Kepler's employment.

142.    Defendants engaged in retaliatory conduct with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such regard.

143.    As a direct and proximate result of Defendants' violation of the NYSHRL, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

144.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, emotional distress damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, punitive damages, interest, attorneys' fees, and costs.

**COUNT V**

**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

**Ms. Kepler v. Defendants (Pavestone and Quikrete)**

145.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

146.    The Plaintiff engaged in protected activity under the ADA, including, but not limited to, requesting and utilizing reasonable accommodations for a disability.

147.    The disability-related accommodation requests which Defendants retaliated against the Plaintiff for requesting included, but were not limited to, taking one or more days off as protected leave.

148.    The Defendants unlawfully coerced, intimidated, threatened, and/or interfered with the Plaintiff's exercising of, or enjoyment of, one or more rights granted by the ADA.

149.    More specifically, the Defendants subjected Ms. Kepler to adverse employment actions, including, but not limited to, subjecting Ms. Kepler to a harassing and otherwise hostile work environment, by inappropriately classifying Ms. Kepler's protected medical leaves as attendance violations on one or more occasions, by denying one or more disability-related accommodations, by skipping one or more disciplinary steps, and/or terminating Ms. Kepler's employment.

150.    The Defendants acted with malice and/or with reckless indifference to the federally protected rights of The Plaintiff.

151.    As a direct and proximate result of the Defendants' violation of the ADA, The Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

152.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other

monetary damages, compensatory damages (including, but not limited to, future pecuniary

losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages,

interest, attorneys' fees, and costs.

WHEREFORE, the Plaintiff, June Kepler, respectfully requests that this honorable

court:

A.  Schedule this matter for trial by jury;

B.  Find the Defendants liable on all counts;

C.  Award the Plaintiff her lost compensation and benefits (including, but not limited

to, back pay and front pay);

D.  Award the Plaintiff other monetary damages, including damages for her

diminished earning capacity and injury to reputation;

E.  Award the Plaintiff damages for emotional distress and other mental and

emotional pain and suffering;

F.  Award the Plaintiff compensatory damages, including, but not limited to, future

pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss

of enjoyment of life, and other nonpecuniary losses;

G.  Award the Plaintiff liquidated damages;

H.  Award the Plaintiff punitive damages;

I.  Award the Plaintiff her reasonable attorney's fees;

J.  Award the Plaintiff interest and costs;

K.  Award the Plaintiff all other damages to which she is entitled; and

L.  Grant such further relief as is just and equitable.

Respectfully Submitted,

June Kepler

By her attorneys,

THE LAW OFFICES OF WYATT &
ASSOCIATES P.L.L.C

Date: July 5, 2022            By:            ___ ___ /s/Chandan Panigrahi_____

Benjamin J. Wyatt, NY BAR # 5604590
BWyatt@Wyattlegalservices.com

Michael Varraso, NY BAR # 5619291
MVarraso@wyattlegalservices.com

Chandan Panigrahi, NY BAR # 5853437
Chandan@wyattlegalservices.com

The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868

New York Office:
418 Broadway, 2nd Floor
Albany, NY 12207